**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

MENA MEKHAEN BOUTROUS,     )
     )
    **Petitioner,**     )
     )   **No. 3:18-cv-00733**
**v.**     )   **Judge Trauger**
     )
GRADY PERRY, WARDEN,     )
     )
    **Respondent.**     )

## MEMORANDUM OPINION

Pending before the court is Mena Mekhaen Boutrous's pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus challenging his 2014 conviction for two counts of aggravated arson and one count of attempted first degree murder. Boutrous is an inmate of the Hardeman County Correctional Facility in Whiteville, Tennessee, where he currently is serving twenty years of imprisonment in the Tennessee Department of Correction. (Doc. No. 1).

The respondent has responded to the petition (Doc. No. 16), and the petitioner has replied to the respondent's answer (Doc. No. 18). The petition is ripe for review, and this court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the court finds that an evidentiary hearing is not needed, and the petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

## I. Procedural History

In October of 2014, a Davidson County Grand Jury indicted the petitioner for two counts of aggravated arson and one count of attempted first degree murder after a fire at Tornado Wireless in Nashville. *State v. Boutrous*, No. M2017-00835-CCA-R3-CD, 2018 WL 935471 (Tenn. Crim. App. Feb. 16, 2018), *perm. app denied* (Tenn. Jun. 6, 2018). Because of the fire, the store and its

owner, Rimon Boutrous, were burned.[1]  *Id.*  The petitioner waived his right to a jury trial.  *Id.*  After a bench trial, the petitioner was convicted of two counts of aggravated arson and one count of attempted first-degree murder.  *Id.* The trial court merged the two counts of aggravated arson and sentenced the petitioner to twenty years for the conviction for aggravated arson and twenty years for the conviction for attempted first degree murder, to be served concurrently.  *Id.*

The Tennessee Court of Criminal Appeals affirmed the petitioner's convictions and sentence on February 16, 2018.  *Id.* The Tennessee Supreme Court denied the petitioner's application for discretionary review on June 6, 2018.  *Id.*  The petitioner did not seek post-conviction relief.

On August 2, 2018, the petitioner filed the instant pro se petition for writ of habeas corpus. (Doc. No. 1 at 6).  By order entered on October 24, 2018, the court directed the respondent to file an answer, plead or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 11). The respondent filed his response on November 5, 2018, conceding that the petition is timely and urging the court to dismiss the petition.  (Doc. No. 16).

The petitioner asserts a single claim for relief:  the trial court erred by failing to allow "documentary medical records to show that [the petitioner] suffered from Paranoid Schizophrenia and that he was not taking his medications regularly."  (Doc. No. 1 at Page ID# 4).  According to the petitioner, the trial court's ruling prevented him from presenting a complete defense in violation of the Fourteenth Amendment to the United States Constitution.  (*Id.*)

## III.    Summary of the Evidence

The Tennessee Court of Criminal Appeals summarized the proof adduced at the defendant's bench trial as follows:

---

[1] The victim is not related to the petitioner.  *State v. Boutrous*, 2018 WL 935471, at *1 n.1.

On a day prior to May 10, 2014, Defendant purchased a used cell phone from Tornado Wireless, the victim's store. Tornado Wireless was located in a strip mall next to a grocery store. The store specialized in selling used cell phones and working on broken or damaged cell phones. The building was owned by Ahmed Sankari, who also operated the grocery store. On May 10, the victim was working at Tornado Wireless along with one of his employees, Mohammed Salem. At some point that day, Defendant entered the store and demanded a refund on a cell phone he had purchased at the store. According to the victim, Defendant threatened to kill the victim if he did not get a refund. The victim informed Defendant that he operated the store with a strict "no refunds" policy.

Defendant exited the store and retrieved a container of gasoline from the trunk of his car. Defendant proceeded to throw gasoline at the store building and inside the store. The victim was in the back of the store at the time Defendant returned. The victim heard the disturbance, walked to the front of the store, and asked Defendant what he was doing. The victim tried to push Defendant out the door. The victim testified that Defendant doused him with gasoline. As Defendant neared the door to the parking lot, he ignited a lighter in his opposite hand. Both the store and the victim were immediately engulfed in flames. Mr. Sankari could see black smoke emanating from Tornado Wireless.

Officer Jiyayi Suleyman of the Metro Nashville Police Department was responding to a "domestic call" in the area near Tornado Wireless. Officer Suleyman "was flagged down by numerous individuals saying there was an individual on fire across the street of Lafayette." When he arrived, Tornado Wireless was on fire and two men were "rustling, tussling" in a physical altercation outside the store. The men were later identified by Officer Suleyman as Defendant and Mohammed Salem.

Soon thereafter, Officer Suleyman saw the victim exit the burning store, "yelling and screaming." Officer Suleyman described that the victim's skin was "coming off his hands and facial area" like "when you light a candle on fire and how the wax drips off." Officer Suleyman tried to get the victim to remain calm despite his obvious pain. The victim, who was twenty-two years of age at the time of the incident, suffered burns on over 60% of his body. At trial, the victim explained that he could no longer "lead his life like a normal person" and it "would be better for [him]" to die. The victim was in the hospital for approximately two months after the incident and still required treatment for residual health problems.

The crowd outside the building reported to the officer that Defendant started the fire. Officer Suleyman spoke to Defendant who was described as "calm and relaxed." Defendant explained to the officer that he came to the store seeking a refund for his purchase and, when the victim refused, Defendant brought the gasoline can into the store to "scare the victim into giving a refund for the phone."

Mr. Sankari was working at his grocery store next door when the incident took place. Mr. Sankari recognized Defendant as a customer of the grocery store. Mr. Sankari stated that Defendant stood out because he had an "eye problem" where his "eyelashes keep blinking." Mr. Sankari asked the victim about Defendant. The victim told Mr. Sankari that Defendant had a "medical issue" for which he was "under treatment."

The building sustained substantial fire damage near the entrance and the countertop inside the store. Kevin Neville, the assistant fire marshal and fire investigator, smelled gasoline vapor "outside in the parking lot." The presence of gasoline was evident inside the store; there was a clear burn pattern inside the store with "heavy charring" on the countertop. Gasoline had clearly been poured "along the counter and on the floor." The only clear point of origin for the fire was the victim himself. It appeared to Mr. Neville that the fire started near the front of the store. Mr. Neville surmised from his investigation that a "gasoline vapor explosion" occurred inside the store near the front of the store.

Defendant's brother, George Boutrous, testified that Defendant came to the United States in 2006. George came to the United States in 2012. When Mr. Boutrous first arrived, he assisted Defendant with taking care of various tickets, court costs, and fees. George helped Defendant get a driver's license and access to a car. Defendant eventually moved in with George. Over objection from the State, he testified that Defendant was prescribed medication for and suffered from mental illness, that Defendant did not "sleep well," and that Defendant started looking "differently" beginning in 2012. George claimed Defendant talked to an "invisible person" and would "fight[ ] with that person who was not actually there." According to George, Defendant did not regularly take the medication that he was prescribed. In fact, Defendant had neglected to take his medication for approximately "forty days to two months" prior to the incident. George also testified that Defendant smoked marijuana on a regular basis.

Defendant testified in his own defense. He claimed that the victim sold him a stolen cell phone. Defendant testified that he took the phone to the store in order to obtain a refund when the victim "started to pick a fight." Defendant walked out of the store, heading to his car to get something "from the trunk and fight." Defendant was going to get some type of jack rod or metal tool but found only a gasoline can. He took the gasoline can into the store to try to "scare" the victim into giving him a refund for the phone. Defendant admitted that he poured gasoline on the counter in front of the victim, covering as much space as possible with gasoline. The victim tried to wrestle the gasoline can out of Defendant's hands. Defendant claimed that during the struggle, gasoline spilled onto the victim's shirt. Defendant eventually got a few steps outside the store before he lit a cigarette lighter at his side. Defendant then recalled the victim running toward him just before "everything was on fire."

Defendant noted that he took several medications, including Haloperidol, Bentropine, and Trazodone and that he had been hospitalized for a mental condition prior to the incident. He claimed that he was not taking his medication on the day of the incident and, at the time, was also smoking marijuana daily. Defendant admitted that he smoked marijuana shortly before the incident. Defendant insisted that prior to the incident, he and the victim were friends who regularly spent time together. In fact, Defendant testified that he merely wanted to scare the victim after the victim refused to give him a refund but that the victim actually threatened Defendant during the incident. Defendant admitted that he was aware of the victim's no refund policy but thought that their friendship may influence the victim's decision to waive the refund policy. Defendant also testified that he was aware the victim was leaving for Egypt the next day and that Defendant may never receive his refund if he did not ask for it on the day of the incident. Defendant explained that this was "the worst thing that [ever] happened to [him]."

At the conclusion of the proof, the trial court found Defendant guilty of both counts of aggravated arson and one count of attempted first degree murder. The trial court merged the two counts of aggravated arson. At a subsequent sentencing hearing, the trial court sentenced Defendant to twenty years for the conviction for aggravated arson and twenty years for the conviction for attempted first degree murder, to be served concurrently.

*State v. Boutrous*, No. M2017-00835-CCA-R3-CD, 2018WL 935471, at \*\*1-3 (Tenn. Crim. App.

Feb. 16, 2018).

## III.     Standard of Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woo*ds, 692 Fed. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

(2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply

with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during

the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

## IV.     Analysis

With these principles in mind, the court will turn to the examination of the sole claim raised in Boutrous's petition for habeas relief: the trial court erred by failing to allow "documentary medical records to show that [the petitioner] suffered from Paranoid Schizophrenia and that he was not taking his medications regularly," a ruling the petitioner alleges prevented him from presenting a complete defense in violation of the Fourteenth Amendment to the United States Constitution. (Doc. No. 1 at 4). The respondent, however, contends that the petitioner's claim is

procedurally defaulted and the petitioner fails to demonstrate cause and prejudice to excuse the default. (Doc. No. 16 at 7-8).

In order to qualify as exhausted, a claim must have been presented to the state's highest court, *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990), and must have been presented in a form which allows the state court a full and fair opportunity to rule on the claim. *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 302-303 (1984); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A prisoner exhausts a claim by "fairly present[ing]" it to the appropriate trial and appellate courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). "A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by English v. Berghui*s, 529 Fed. App'x 734 (6th Cir. 2013). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citation omitted).

Because relief under § 2254 can only be based upon a violation of the United States Constitution or law or treaties of the United States, the claim must have been presented as an issue of federal constitutional law, not state law. *See Anderson v. Harless*, 459 U.S. 4, 6-7 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (internal citations omitted); *Koontz v. Glossa*,

731 F.2d 365, 368 (6th Cir. 1984) (holding that a petitioner must have presented his claim in the state court "as a federal constitutional issue-not merely as an issue arising under state law.").

On direct appeal to the Tennessee Court of Criminal Appeals, the petitioner argued in his brief that "[t]he trial court erred when it prohibited the defense from introducing evidence of Mr. Boutrous' mental health at [his] trial." (Doc. No. 13, Attach. 26 at 20). According to the respondent, the petitioner raised his claim on direct appeal solely as a state law claim. (Doc. No. 16 at 7-8). True, the petitioner raised this claim as a state law claim, relying heavily on state law cases and Tennessee Rules of Evidence 401, 702, and 803(4). (*Id*. at 20-21). However, the petitioner also relied on the United States Constitution and federal cases, recounting that the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284 (1973), "established a more expansive view of the full meaning of due process" which the Tennessee Supreme Court adopted in *State v. Brown,* 29 S.W.3d 427 (Tenn. 2000). (*Id*. at 26, 28-29). He argued that "the trial court err[ed] . . . when it denied [him] the right to present this evidence because that decision was contrary to his due process rights under both Constitutions as well as *Brown* and *Chambers*." (*Id*. at 23) (emphasis added).

In responding to the petitioner's claim in its brief to the state appeals court, the State analyzed the petitioner's claim under both state and federal law. (Doc. No. 13, Attach. 27 at 24). Indeed, the State devoted a full paragraph to comparing the petitioner's situation to the defendant's situation in *Chambers*. (*Id*. at 28). When the Tennessee Court of Criminal Appeals considered the defendant's medical records claim, the court specifically noted the petitioner's reliance on *Chambers* and cited *State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007), for the proposition that "[e]xclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v.*

*Boutrous*, 2018 WL 935471, at *6. Thus, the state appellate court was fully aware of the federal constitutional dimensions of the plaintiff's claim. Consequently, the court finds that the petitioner fairly presented a federal due process claim to the state courts. *See Dye v. Hofbauer*, 546 U.S. 1, 3-4 (2005) (claim that included citations to specific provision of the Constitution and four federal cases alerted the state court that the claim "was based, at least in part, on a federal right"); *Trimble v. Bobby*, 804 F.3d 767, 781 (6th Cir. 2015) (federal claim fairly presented to state court where argument explicitly cited three federal constitutional provisions and four Supreme Court cases in support).

The court will now turn to the merits of the petitioner's sole habeas claim. States have "broad latitude" to "establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). "[W]ell established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326 (internal citations omitted). The Supreme Court has made clear that the Constitution allows trial judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Id*. at 326–27 (quoting *Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986)).

However, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Id*. at 324 (quoting *Crane*, 476 U.S. at 690). This guarantee encompasses "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary," which is "a fundamental element of due process." *Washington v. Texas*, 388 U.S. 14, 18 (1967). Evidentiary

rules that "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" violate the accused's right to present a complete defense. *Holmes*, 547 U.S. at 324 (internal quotations and alterations omitted). However, "[o]nly rarely" has the Supreme Court held "that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

Here, the petitioner argues that he "was denied his right to present a complete defense, a right protected by the Due Process clause of the Fourteenth Amendment to the United States Constitution," because the trial court "did not allow the Petitioner to introduce documented medical evidence which could have engendered reasonable doubt in the mind of the finder of fact about the requisite mens rea, which would have resulted in the Petitioner being convicted of lesser-included offenses and thus being sentenced to less time in prison." (Doc. No. 1 at 11).

At the opening of the petitioner's trial, defense counsel made a motion for an interlocutory appeal after the court ruled that the petitioner could not introduce medical records showing the petitioner's history of mental illness and drug use prior to and at the time of the offenses. (Doc. No. 13, Attach. 3 at 5-14). As defense counsel explained, "[w]e seek an interlocutory appeal because it's probable without the evidence, the Court is [sic] precluded, the defendant may suffer the irreparable injury of being unable to offer an effective defense and be convicted of extremely serious charges in the indictment." (*Id.* at 13). Defense counsel argued that "the only defense that I can present is to try to show that this man, because of his mental illness, because of the drugs he was taking, that there is a reasonable doubt that he had the culpable mental state involved. That's what the whole defense is about." (*Id.* at 9-10). The trial court denied the motion without explanation. (*Id.* at 20).

After the petitioner was convicted, defense counsel filed a motion for new trial, in which he argued that the trial court erred in excluding the defendant's medical records and certain testimony offered at trial by the defendant and his brother related to the defendant's mental health condition. (Doc. No. 13, Attach. 1 at 100-01). The trial court summarily denied the motion. (*Id.* at 105).

On direct appeal, the Tennessee Court of Criminal Appeals summarized and ruled on the petitioner's complete defense claim as follows:

> Defendant also argues that the exclusion of the medical records somehow prohibited him from presenting a defense. He cites *Chambers v. Mississippi*, 410 U.S. 234, 302 (1973), and *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000), to support his argument. "Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v. Flood*, 219 S.W.3d 307, 315–16 (Tenn. 2007). "Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." *Id.* at 316 (citing *Chambers*, 410 U.S. at 294; *Brown*, 29 S.W.3d at 431). In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *Brown*, 29 S.W.3d at 433–34 (citing *Chambers*, 410 U.S. at 298–301). We must carefully consider the facts of the case to determine whether the constitutional right to present a defense was violated by this exclusion of evidence. *See id.* at 433.
>
> Here, as mentioned above, Defendant failed to establish the relevance of the mental health records because he never established how or why the mental health records were relevant to negate the mens rea. Without establishing the threshold relevance, Defendant cannot show that the evidence was critical to the defense. Defendant was not prevented from presenting a defense by the trial court's exclusion of the mental health records. In fact, both he and his brother testified, even if on a limited basis, as to Defendant's existing mental health issues. Defendant is not entitled to relief on this issue.

*State v. Boutrous*, 2018 WL 935471, at *6.

The Tennessee Court of Criminal Appeals's rejection of the petitioner's right to present a complete defense claim was neither contrary to clearly established law nor an unreasonable application of it.

First, the Tennessee Court of Criminal Appeals did not "appl[y] a rule that contradicts the governing law" set out by Supreme Court precedent for complete defense claims. *Williams*, 529 U.S. at 405. Before analyzing the petitioner's claim, the court acknowledged that "'[p]rinciples of due process require that a defendant in a criminal case have the right to present a defense and offer testimony.'" *Boutrous*, 2018 WL 935471, at *6 (quoting *State v. Flood*, 219 S.W.3d 307, 316 (citing *Chambers*, 410 U.S. at 294)). The court then noted that standard set forth in *Chambers*:

> In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *Brown*, 29 S.W.3d at 433–34 (citing *Chambers*, 410 U.S. at 298–301).

*Boutrous*, 2018 WL 935471, at *6. Thus, the rule that the Tennessee Court of Criminal Appeals applied was not "contrary to" clearly established federal law. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405; *see Vaughn v. Perry*, No. 16-cv-02598, 2018 WL 3729079, at *10 (M.D. Tenn. Aug. 6, 2018) (applying *Chambers* as interpreted by Tennessee state courts in *Brown* and *Flood* in determining whether an exclusion of evidence rises to the level of a federal constitutional violation).

The petitioner argues that the Tennessee Court of Criminal Appeal's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding" because the medical records were relevant and critical to his defense and, therefore, the Tennessee Court of Criminal Appeal's decision affirming the trial court's ruling that the

medical records were not relevant was based on an unreasonable determination of the facts in light of the evidence presented. A review of the record does not support the petitioner's position.

The Supreme Court repeatedly has held that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). "But only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Id.* In *Chambers*, the Supreme Court found such a violation where the defendant had been prevented from presenting evidence that was "critical" to his defense—specifically, testimony about a third party's repeated confessions to the murder for which the defendant was on trial. *Chambers*, 410 U.S. at 302.

Here, it was not unreasonable for the state courts to conclude that the medical records were not "critical" to the petitioner's defense. The petitioner never established how or why the records were relevant to negate mens rea. The state appellate court found that, without establishing their relevance, he could not show that the evidence was critical to the defense. The challenged medical records included records from

> Middle Tennessee Mental Health Institute, Centerstone Community Mental Health Center, and Correctcare. According to Defendant, the mental health records would indicate that Defendant was hospitalized in October 2011 and received a diagnosis of "a substance induced psychotic disorder with hallucinations; PTSD; cannabis abuse; and alcohol abuse." Defendant reported to medical personnel that he "heard voices." A mental status examination revealed Defendant to be "calm and cooperative" as well as "alert and oriented." Defendant was also found to lack "the ability to avoid danger" and possessed poor judgment. Defendant responded well to medication but was hospitalized again about one month later. This time, Defendant did not report hallucinations and, again, responded to the administration of medication. Defendant was evaluated again a few years later, in January 2013, after encouragement from his brother. This evaluation listed Defendant's diagnosis as schizophrenia and cannabis abuse. In January 2014, Defendant claimed he was taking his medication, but it was reported by his brother that he was actually refusing to take the medication. A final evaluation in April 2014, less than two weeks prior to the offense, revealed that Defendant was not taking his medication

> regularly but did not report problems with his mood or the occurrence of any
> outbursts. Following incarceration, Defendant's mental health records indicated
> "chronic simple schizophrenia" as one of his problems.

*State v. Boutrous*, 2018 WL 935471, at *3.  Importantly, however, the records themselves do not explain how schizophrenia would affect the petitioner's—or anyone's—ability to act deliberately, intentionally, or knowingly.  *See* Tenn. Code Ann. §§ 39-41-301, 302 (arson and aggravated arson both require the defendant to have acted "knowingly"); Tenn. Code Ann. § 39-12-101(a)(3) (attempt requires "an intent to complete a course of action or cause a result"); Tenn. Code Ann. § 39-13-202(a)(1) (first degree murder is defined as the premeditated and intentional killing of another person).  Without context and explanation, the mental health records do not make it more or less likely that the defendant had the ability to act deliberately, intentionally, or knowingly on the day of the offenses.  Stated differently, the defendant did not connect the records to his mental state at the time of the offense and, in the absence of this connection, it was inappropriate for the trial court to speculate as to why the records mattered.  *See United States v. Rigger*, No. 3:08-CR-27, 2009 WL 307641, at *2 (E.D. Tenn. Feb. 5, 2009) (finding that the court "cannot speculate" as to the defendant's state of mind); *United States v. Cty. of Muskegon*, 298 F.3d 569, 585 (6th Cir. 2002) ("[S]peculation cannot suffice; [the Court] need[s] proof."); *State v. Hester*, 324 S.W.3d 1, 57-58 (Tenn. 2010) (affirming jury instruction that "doubts based purely upon speculation" are not reasonable doubts).  As the trial court explained, an expert witness could have provided the context and explanation missing from the defendant's argument; however, the defense never presented such testimony. [2]

---

[2] In making his motion for an interlocutory appeal, defense counsel told the trial court that he had consulted with two different psychiatrists who could testify that  it was possible that the defendant lacked the capacity to form the necessary mental state, but they could not say that he definitely lacked the capacity.  (Doc. No. 13, Attach. 3 at 6). Further, the psychiatrists couldn't "give an opinion about how [the defendant] was" at the time of the offense since he had been taking his medications while in jail.  (*Id.*)  Defense counsel determined that the testimony of these psychiatrists would not be admissible.  (*Id.*)

The petitioner argues that, because the trial court permitted the admission of the victim's medical records into evidence without the testimony of an expert witness to show their relevance, the trial court should have allowed the admission of the defendant's mental health records without expert testimony because "[t]hey were presented for the same reason: because they had a 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" (Doc. No. 1 at 18-19). However, the defendant's mental health records, standing alone, offered no opinion as to whether the defendant could form the required mens rea for the offenses. The records were only relevant to the extent they shed light on whether the defendant had the ability to form the required mens rea for the offenses. Conversely, the victim's medical records documenting his injuries were sufficient to show that the victim nearly died as a result of his burns, Tenn. Code Ann. § 39-13-202(a)(1), and suffered the required "serious bodily injury" required for a conviction of aggravated arson, Tenn. Code Ann. § 39-14-302 .

The petitioner states that "[p]aranoid schizophrenia is not unfamiliar to laymen, much less highly-educated and intelligent trial judges." (Doc. No. 1 at 8). As a result, he argues that "[n]o expert was needed to explain to the finder of fact in this bench trial what schizophrenia was" or to explain "that is causes a person to be unable to tell reality from imagination, to wrongly believe that others are trying to harm them . . . and that when left untreated and exacerbated by illegal drug use, it can lead someone to do things that a reasonable person without criminal intent would never do, like pour gasoline in a business full of people and strike a flame." (*Id*. at 9). The defendant's position all along has been that "common sense would tell you if somebody has a mental illness prior to a criminal offense and still had the mental illness afterwards and if there was evidence he was not on his medication at the time," this evidence could create reasonable doubt as to that

defendant's ability to form the required mes rea for the offenses. (Doc. No. 13, Attach. 3 at 19). However, the trial court, acting as factfinder in the defendant's bench trial, found that it needed further testimony to explain how the petitioner's mental health issues could have negated his mens rea on the day of the offenses. The appellate court agreed with the trial court's finding.

To the extent that the petitioner argues that the medical records satisfied the requirements of expert proof through the conclusions reached by qualified medical personnel regarding the defendant's mental illnesses and diagnosis as recorded in the records themselves, this theory supports the petitioner's state law due process claim, not his federal due process claim.[3] A claim that the state courts misapplied Tennessee law in convicting the petitioner is not cognizable in a federal habeas petition. *See* 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"). Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Simply put, this court cannot consider whether Boutrous's sentence was imposed in violation of Tennessee evidentiary law—an argument the petitioner spends significant time advancing in his brief. *See Smith v. Parker*, No. 10-1158-JDB-egb, 2013 WL 5409783, at *30 (W.D. Tenn. Sept. 25, 2013) (dismissing petitioner's federal habeas claim that Tennessee courts

---

[3] The petitioner challenges the state courts' decision that the in-court testimony of an expert witness is the only way to introduce mental health evidence for the purpose of negating mens rea. (Doc. No. 1 at 15-16). Even if the petitioner has accurately characterized the state courts' holding, the petitioner's argument supports a state law claim. The petitioner maintains that Tennessee courts misapplied Tennessee evidentiary rules and case law regarding whether and when medical records are admissible and relevant in a criminal trial. The state appellate court analyzed this argument separately from the arguments in support of the petitioner's due process claims. *See State v. Boutrous*, 2018 WL 935471, at **3-6.

misapplied state law in sentencing him where petitioner couched his claim to the state courts as arising under state law only).

Returning to the petitioner's federal due process claim, the petitioner hangs his hat on the notion that the excluded medical records were critical to the defense, and therefore relevant, because defense counsel repeatedly argued to the trial court that if he could not have the medical records admitted he could not effectively attack the mens rea element of the charged offenses. (*See, e.g*., Doc. No. 1 at 4, 14; Doc. No. 13, Attach. 26 at 29). But this argument is not persuasive. Defense counsel cannot establish the criticality of evidence simply by designating it as such.

And, in fact, the medical records were not the only way defense counsel had available to him, and which he utilized, to attack the mens rea element of the charged offenses. First, defense counsel called as a witness the defendant's brother, who testified that he immigrated to America in 2012, leaving his wife and family in Egypt, for the specific purpose of taking care of his brother due to his mental illness (Doc. No. 13, Attach. 3 at 102-03); he observed problems with the defendant's mental health in 2012 (*Id*. at 101); he testified that defendant was not taking his medication for 40-60 days leading up to the offenses (*Id*. at 103, 107, 114) and that the defendant was using illegal drugs at that same time (*Id*. at 114-15); he further testified that, when the defendant was off his medication and taking illegal drugs, he did not sleep well and looked "differently," behaved abnormally, talked to "invisible people, and fought with persons who were not actually there." (*Id*. at 100-01).[4]

---

[4] The petitioner argues that "the record shows that whenever the Petitioner or his brother testified" regarding the defendant's mental health, "the State would object, and the Court always sustained the objections, meaning that the 'limited basis' testimony referred to by the TCCA was not taken into account by the finder of fact." (Doc. No. 1 at 19-20). The petitioner is mistaken. Although the trial court did not permit the defendant's brother to testify as an expert regarding the defendant's mental health, the trial court permitted the defendant's brother to testify "as a lay person that he, you know, believes [the defendant]'s mentally ill." (Doc. No. 13, Attach. 3 at 99-100). In addition, the trial court prohibited the defendant's brother from testifying as to the contents of the defendant's medical reports he had read, but permitted the defendant's brother to testify about his brother's behavior which he personally observed. (*Id*. at 100-01).

Next, the defendant himself testified. Although the petitioner asserts that, "[a]s far as the determination of guilt or innocence was concerned, this testimony never happened, and the Petitioner was deprived of any exculpatory benefit that could have come from it" (Doc. No. 1 at 13), the record belies the petitioner's assertion. The defendant testified that he was not taking medication at the time of the offenses (Doc. No. 13, Attach. 3 at 115-17); that he was smoking marijuana on a daily basis around the time of the offenses (*Id*. at 117); that he was taking Haloperiodol, Benztropine, and Trazodone during his trial (*Id*. at 115-17); that he has been hospitalized for his mental condition in the past (*Id*. at 124);[5] and that he needed to take medication because when he had not taken medication in the past he "would be doing things that [he] shouldn't" (*Id*.). The court would not permit defense counsel to question the defendant on redirect about prior occasions when he heard voices "commanding him to do things." (*Id*. at 134).

During his testimony, when the defendant described what happened during the offenses, he did not assert that he heard voices or was not in control of his actions. (*Id*. at 119-23). When the State asked him if he was hallucinating while driving on the way to the store on the day of the offenses, he answered, "Not much, no." (*Id*. at 125). He testified as to what he was thinking at the time of the offenses. (*Id*. at 120). He said it was "the worst thing that happened" to him and he remembered everything that happened at the store "very clearly." (*Id*. at 133).

Despite the petitioner's insistence that "the refusal of the Trial Court to countenance evidence that might negate the mens rea denied the Petitioner his right to present any defense, never mind a complete defense" (Doc. No. 1 at 13), the testimony of the defendant and his brother related to the defendant's mental health condition shows that the petitioner was able to raise his

---

[5] During the defendant's direct examination, the trial court would not allow the defendant to testify about his prior hospitalizations, sustaining the State's objection that the testimony was irrelevant. (Doc. No. 13, Attach. 3 at 116-17). However, during the defendant's cross examination, the court allowed the defendant's testimony affirming that he had been hospitalized for a "mental condition in the past." (*Id*. at 124).

mental health as a defense to forming the required mens rea for the offenses. As the state appellate court recognized: "Defendant was not prevented from presenting a defense by the trial court's exclusion of the mental health records. In fact, both he and his brother testified, even if on a limited basis, as to Defendant's existing mental health issues." *Boutrous*, 2018 WL 935471, at *6.

Furthermore, defense counsel presented additional proof at trial disputing mens rea which was unrelated to mental health. Both the defendant and his brother testified that the defendant was friends with the victim and had smoked marijuana with the victim on several prior occasions, testimony which could counteract motive, which is relevant to premeditation. (Doc. No. 13, Attach. 3 at 117-18). *See Alley v. Bell*, 101 F. Supp.2d 588, 655 (W.D. Tenn. 2000) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)) (a jury may infer premeditation from an accused's motive to kill the victim). The defendant testified that he was angry with the victim, supporting the defense theory that he acted passionately, rather than deliberately, which supports an alternative, lesser offense to premeditated murder. (Doc. No. 13, Attach. 3 at 126). *See* Tenn. Code Ann. § 39-13-202(d) (setting forth that premeditation is an act done after the exercise of reflection and judgment). In addition, the defendant testified that he lit the victim on fire accidentally and that he only wanted to scare the victim (Doc. No. 13, Attach. 3 at 120, 122-23); that he spilled the gasoline on the victim as they struggled over it (*Id*. at 120); that when he was trying to leave the store, the victim attacked him (*Id*. at 120, 123); that he lit his cigarette lighter and held it at his side, not thinking "by lighting the cigarette lighter that this was going to cause Rimon to catch on fire" (*Id*. at 121) – all testimony that disputed the intent element of first degree murder.

In *Chambers*, the case on which the petitioner so heavily relies, Mississippi's "voucher rule" completely prevented the defendant from questioning a witness and introducing evidence

showing that the witness had confessed to the crime for which the defendant was charged. 410 U.S. at 291-95. Here, however, the defendant was able to present his theory of defense and introduce proof in support of it, just not the proof he would have preferred. Considering the evidence the defendant had the opportunity to present, the trial court's ruling did not preclude him from challenging mens rea, or putting on any defense at all, as he alleges.

Viewed through AEDPA's deferential lens, the state courts' rejection of the petitioner's federal due process claim was consistent with clearly established law and based on a reasonable determination of the facts in light of the evidence presented. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68. Thus, to form a basis for habeas relief, the evidentiary ruling in question must be "so fundamentally unfair" as to violate due process. *Bey v. Bagley*, 500 F.3d 514, 519–20 (6th Cir. 2007); *Fields v. White*, No. 15-38-ART, 2016 WL 3574396, at *22 (E.D. Ky. June 23, 2016). Such was not the case here.

## V.    Conclusion

For the reasons set forth herein, the petition filed by Mena Boutrous seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to

deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of the petitioner's claim, the court will deny a COA.

An appropriate order will be entered.

Aleta A. Trauger
United States District Judge